UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| GROUND ZERO CENTER FOR NONVIOLENT ACTION, WASHINGTON PHYSICIANS FOR SOCIAL RESPONSIBILITY, and GLEN S. MILNER,<br><br>          Plaintiffs,<br><br>   v.<br><br>UNITED STATES DEPARTMENT OF THE NAVY, et al.,<br><br>          Defendants. | Case Nos.: 12-cv-5537<br><br><br>ORDER ON COMPETING MOTIONS FOR SUMMARY JUDGMENT<br><br>[Dkt. #s 91 & 99] |

## I.     INTRODUCTION

Before the Court are competing Motions for Summary Judgment [Dkt. #s 91 and 99].

The parties' arguments track their respective positions on the Motion for Preliminary Injunction

[Dkt. #15].  Ground Zero Center for Nonviolent Action, et al. (Ground Zero) shifts its emphasis

on summary judgment from traditional environmental concerns (flora, fauna and fish impacted

by construction) to the possibility of catastrophic impact caused by accidental detonation while

missiles are being loaded onto submarines.  Ground Zero now asks the Court to halt construction

of the new Explosives Handling Wharf and direct the Navy to supplement its Environmental

Impact Statement to address these concerns, necessarily asking it to release information detrimental to national security in the process.

The Motions chronicle all of the issues Ground Zero presented in seeking a preliminary injunction. The Court heard oral argument and wrote an extensive opinion denying the Motion for Preliminary Injunction [Dkt. #72]. Since then, nothing has changed to compel the Court to deny Plaintiffs' motion and grant Defendants' motion; the Administrative Record, the facts and the controlling legal precedents all remain the same, and compel instead a consistent result.

## II.    FACTUAL BACKGROUND

### A.  The Trident Program and Explosive Handling Wharfs

The U.S. Navy's Trident program is a sea-based deterrent missile system. The Trident II fleet ballistic missile is a "submarine-launched ballistic missile that can be armed with nuclear warheads." Unsurprisingly, Trident missiles and submarines require specialized facilities, including the Explosive Handling Wharfs (EHWs) at issue here. The adequacy of the Trident Support Facilities is a matter of significant importance to national security. This is particularly true for the EHWs because the Navy must frequently move the Trident II missiles on and off of the submarines. The wharfs allow the Navy to conduct maintenance and upgrades to the submarines. Bangor currently has one EHW.

The current wharf operates continuously during the year, less 60 days allotted for maintenance (and other limiting factors). This period—one year minus 60 days—constitutes the wharf's "operational capacity." Until recently, EHW-1 met the Navy's needs.

In the 1990s, the Navy began using a new type of missile: the Trident II D5. The D5 is larger and more complex, and requires more time to handle and maintain than its predecessor. Thus, the Navy started the "D5 Life Extension Program" in order to upgrade the missiles—

particularly their electronics—as they become "technologically obsolescent."  As the missiles age, upgrades and maintenance naturally will become more frequent—necessitating increasing use of the explosives handling wharf.

Like the missiles, the existing wharf needs increasing maintenance, including replacement of its piles.  It cannot, of course, be used during much of the construction period, and the wharf's operational capacity will thus decline.  Indeed, the Navy expects EHW-1's operational capacity to decline so much as to create an "operational shortfall," which represents a risk to the operability, reliability, safety, and security of the Trident II system, and ultimately, to national security.   During the repair period, the existing wharf will be available only 185 days per year.  But, due to the D5 Life Extension Program, the Navy has determined a need for 400 operational days.  Thus, even after the repairs to EHW-1 are complete, the existing wharf will *still* be unable to meet the Navy's needs. Without a second wharf—EHW-2—the Navy argues that it will become increasingly unable to manage the risks associated with the operational shortfall.

In short, facing the need for 400 operating days, the Navy concluded that a second explosive handling wharf was necessary.

**B.  The Navy's Environmental Review Process**

Before obtaining a permit to build the EHW-2, the Navy conducted an environmental review, as required by NEPA, the Clean Water Act, the Endangered Species Act, the Marine Mammal Protection Act, and the Coastal Zone Management Act.  The environmental review commenced with a notice of intent to prepare an EIS published on May 15, 2009.

As part of the environmental review, the Navy conducted a biological assessment to analyze the effects of EHW-2 on several ESA-listed species.  The Navy determined that the

second wharf "was likely to adversely affect" ESA-listed species, and thus, it requested that the National Marine Fisheries Service prepare a biological opinion ("BiOp"). On September 29, 2011, the Fisheries Service issued its BiOp and incidental take statement, concluding that the proposed wharf would not affect the population viability of the ESA-listed salmon species (despite some injury or death to individual fish), and therefore, the species would not be jeopardized.

On March 18, 2011, the Navy circulated a draft-EIS for public comment. The draft disclosed that the Navy intended to install 1,250 steel pilings and that its new wharf would cover 6.3 acres of water and extend 600 feet from the shoreline. Among other considerations, the draft-EIS explored the effects of underwater construction noise and the presence of the wharf on ESA-listed species. On October 3, 2011, the Navy released a supplement to the draft-EIS for public comment.

The Navy published a notice of availability of the final EIS on March 30, 2012. 77 Fed. Reg. 19281 (Mar. 30, 2012). A record of decision was issued on May 4, 2012, and published on May 18, 2012. Notice of Availability of EHW-2 R.O.D., 77 Fed. Reg. 29620 (May 18, 2012).

In the EIS, the Navy examined (among other things) the effects of underwater construction noise on marine mammals, birds, and fish, the effects on food sources, and the effects on traffic near Bangor. The EIS disclosed that underwater construction noise may cause levels of sound injurious to fish. The Navy also considered mitigation measures to reduce potential damage caused by construction, including: (1) efforts to protect marine water quality and seafloor during construction; (2) a limited in-water work window; (3) efforts to protect upland water quality during construction; (4) efforts to protect water quality during operation; (5) noise attenuation techniques during construction; (6) monitoring noise impacts; and

(7) mitigation measures for biological, cultural, and other resources. Additional mitigation measures include limiting the use of impact hammering, which creates higher levels of injurious sound, and a "soft-start approach" for pile driving to provide a warning to fish prior to the drivers operating at full capacity.

Additionally, the Navy considered five alternative forms for the new wharf: (1) a combined trestle with large pile wharf (the preferred alternative); (2) a combined trestle with conventional pile wharf; (3) separate trestles with large pile wharf; (4) separate trestles with conventional pile wharf; and (5) a combined trestle with floating wharf.

The Navy identified these alternatives based upon (1) their capability of meeting Trident mission requirements; (2) the ability to avoid or minimize environmental consequences; (3) siting requirements, including proximity to existing infrastructure; (4) the availability of waterfront property; (5) the ability to construct essential project features; and (6) master planning issues, such as explosive safety restrictions. The Navy also considered a "no-action alternative," but as outlined above, the Navy argued that the need for increased operational days mandates action.

### C. Construction Plans for EHW-2

Plans for the second wharf were detailed in the EIS. The EHW-2 would be located 600 feet offshore in water 60–100 feet deep. The wharf would consist of a launch wharf and a warping wharf extending from the main wharf to line up submarines and provide a safety barrier between a submarine and EHW-1.

Construction of EHW-2 is scheduled to occur between September 2012 and January 2016. Offshore construction would include installation of piles using hammers and pile drivers. The Navy estimates that less than 1,000 impact strikes a day are likely necessary to complete the

project; a less likely—but possible—scenario would result in up to 6,400 impacts per day.  To minimize potential damage caused by the underwater noise of pile driving, the Navy would limit certain in-water work to between July 16th and February 15th.[1]  Pile driving would also be limited to daytime: striking could not begin until two hours after sunrise and would end two hours before sunset to avoid harm to foraging species.

The Navy states that it has carefully planned the construction in order to have the second wharf operational by its deadline—October 2016.  At that time, the Navy expects a significant operational shortfall.  That shortfall will have "negative impacts to the operability, reliability, safety and security of the Trident II System, eventually reaching a point that they will pose a significant risk to national security."

The construction schedule is further complicated by environmental concerns, ongoing operations at Bangor, and space limitations.  The available space at the project location physically limits the amount of construction equipment that can safely operate at the site at any one time.   Further restrictions, such as the shortened work-window and a cap on daily pile-strikes, limit the number of piles which can be installed each day and increase the risk of potential delay.  The Navy argues that delay to any part of the construction schedule may delay all construction that follows.

### D.  Ground Zero's Arguments

Ground Zero argues that the Navy withheld information crucial to the public review process, information which should have been disclosed under NEPA.  This information includes five documents: Appendices A, B, and C to the EIS, the Facility Design Criteria, and the Business Case Analysis.  The Navy withheld all three Appendices and the Facility Design

---

[1] Except in 2012, when in-water work will not start until the commencement of the project on Sept. 27.

1 Criteria as unclassified controlled nuclear information ("UCNI") and withheld the Business Case

2 Analysis as classified.  The Navy withheld these documents during the NEPA process, but

3 released redacted appendices during this litigation.  The Court has reviewed the unredacted

4 documents *in camera*.

5   Appendix A is six pages long and discusses the Navy's need for an additional wharf.

6 Most of the information was disclosed in both the draft and final EISs.  The Navy withheld,

7 however, portions of Appendix A discussing the risks associated with the lack of capacity at the

8 existing wharf, as well as the specific steps that the Navy is taking to manage those risks,

9 including methods of missile handling and staffing decisions.

10   Appendix B outlines alternatives that the Navy considered but that were not carried

11 forward for additional analysis.  The Navy argues that the draft and final EISs summarized

12 Appendix B, which contains only additional information on such alternatives as expediting

13 repairs at the existing wharf, relocating submarines, and modifying facilities.  In essence,

14 Appendix B contains alternatives that the Navy found so unreasonable as to require no further

15 consideration.

16   Appendix C "contains explosives safety arcs" for both the existing and proposed wharfs.

17 The risk of explosion arises from missile fuel.  The Navy disclosed only one paragraph, which

18 describes the safety arcs in general terms.  It argues that the undisclosed portion of Appendix C

19 cannot be disclosed.  Concerning the explosives risks, the EIS states that operations at the EHW-

20 2 would be no different from operations at the existing EHW-1.  Ground Zero stresses that the

21 Navy failed to disclose that the Department of Defense's Explosive Safety Board did not accept

22 safety risks associated with proposed separation between EHW-1 and proposed EHW-2.  But the

23

24

1    Department of Defense did grant a conditional site approval. The Navy also argues that

2    disclosure of the explosive safety arc information presents a non-justiciable issue.

3        The Facility Design Criteria is a document commissioned by the Navy and drafted by

4    Lockheed Martin that specifies certain design necessities of the proposed wharf. The Design

5    Criteria includes "facility support" such as lightning towers, cranes, utility booms, access

6    trestles, and other necessities of an explosive handling wharf. Ground Zero argues that the

7    Design Criteria is cited as the reason for certain environmentally significant project features and

8    should have been disclosed. For example, Ground Zero notes that the Design Criteria precluded

9    the use of grating, which would allow more light for the benefit of marine life,[2] and the Criteria

10    control the width of the wharf trestles and the size of the support building.[3]

11        The Business Case Analysis represents the Navy's assessment of future Trident program

12    needs. The EIS presents the conclusions of the Business Case Analysis, explaining that the Navy

13    requires explosive handling wharves with 400 operational days per year due to changing

14    operational and weapons system requirements—i.e., the D5 Life Extension Program. The EIS

15    further explains the limited capacity of the existing wharf and the timetable within which the

16    Navy must fix the operational shortfall.

17        Lastly, Ground Zero argues that the NEPA process was deficient because the Navy

18    predetermined the outcome, and the Navy failed to adequately analyze reasonable alternatives,

19    mitigation measures, or the possibility of a catastrophic accidental explosion. They urge this

20    Court to set aside the Navy's decision to build the second wharf, and order the Navy to

21    supplement the EIS with "more information" about safety impacts. The Navy argues that they

22

---

23   [2] The EIS states that grating was rejected because it would be ineffective, given the weight and thickness that would be required. EIS at 2-5.

24   [3] The EIS notes that trestles are the minimum width allowable by the Facility Design Criteria. EIS at 2-27.

have shared all information that they can; consistent with national security, statutory strictures and precedent. These same considerations prevent a public debate about the most sensitive details touching on the safety of our men and women in uniform.

### III. DISCUSSION

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact which would preclude summary judgment as a matter of law. Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to present, by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In other words, "summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable [fact finder] could return a [decision] in its favor." *Triton Energy*, 68 F.3d at 1220.

Federal courts review agency decisions on an "arbitrary and capricious" standard under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 375 (1989). An agency decision is arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Northwest Environ. Defense Cntr. v. Bonneville Power Admin.*, 477 F.3d 668, 687 (9th Cir. 2007) (internal citation omitted).  If the agency fails to conform to the standards of the APA, a court may "hold unlawful and set aside any agency action, findings, and conclusions."[4]  5 U.S.C. § 706; *see also id*.  Review is limited in scope, and a court "is not to substitute its judgment for that of the agency."  *Motor Vehicles Mfgs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  "The relevant inquiry is whether the 'agency considered the relevant factors and articulated a rational connection between the facts found and the choice made.'"  *Pyramid Lake Paiute Tribe v. U.S. Dep't of Navy*, 898 F.2d 1410, 1414 (9th Cir. 1990) (quoting *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 981 (9th Cir. 1985)).

## A.  The Navy Was Justified in Withholding Certain Information from NEPA Review

Ground Zero asserts that the Navy failed to comply with NEPA by withholding Appendices A, B, and C, the Facility Design Criteria, and the Business Case Analysis.  They argue that late disclosure of portions of these documents proves the Navy improperly withheld the documents during the public-comment stage of the NEPA process.

NEPA has "twin aims": to obligate federal agencies to consider "significant aspects of the environmental impact of a proposed action," and "to inform the public that [the agency] has indeed considered environmental concerns . . . ."  *San Luis Obispo Mothers for Peace ("SLOMP") v. Nuclear Regulatory Comm'n*, 635 F.3d 1109, 1115 (9th Cir. 2011) (quoting *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983)).  The process grants the public and

---

[4] Title 5 U.S.C. § 706(2) provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law; (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of any agency hearing provided by statute; or (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court."

1  government officials the opportunity to participate before action on a project begins.  40 C.F.R.

2  1500.1(b).  NEPA allows the public to "play a role in both the decision making process and the

3  implementation of that decision."  *See Robertson v. Methow Valley Citizens Council*, 490 U.S.

4  332, 349 (1989).  NEPA offers the public an opportunity to scrutinize an agency's action, which

5  should be based upon "[a]ccurate scientific analysis [and] expert agency comments . . . ."  40

6  C.F.R. 1500.1(b). "Most important[ly], NEPA documents must concentrate on the issues that are

7  truly significant to the action in question, rather than amassing needless detail."  *Id.*

8      A federal agency must prepare an EIS for major actions "significantly affecting the

9  quality of the human environment."  42 U.S.C. § 4332 (2)(C); 40 C.F.R.§ 1501.3.  A reviewing

10  court determines "whether an EIS contains a 'reasonably thorough discussion of the significant

11  aspects of the probable environmental consequences.'" *California v. Block*, 690 F.2d 753, 761

12  (9th Cir. 1982) (citing *Trout Unlimited, Inc. v. Morton*, 509 F.2d 1276, 1283 (9th Cir. 1974)).

13  Thus, a court must "make a pragmatic judgment whether the EIS's form, content and preparation

14  foster both informed decision-making and informed public participation." *Id.* (citing *Warm

15  Springs Dam Task Force v. Gribble*, 565 F.2d 552 (9th Cir. 1977)).  Under the "rule of reason"

16  standard, the "reviewing court [does not] substitute its judgment for that of the agency

17  concerning the wisdom or prudence of a proposed action.  Once satisfied that a proposing agency

18  has taken a 'hard look' at a decision's environmental consequences, the review is at an end."  *Id.*

19  (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)).

20      NEPA's public-disclosure requirements are expressly governed by FOIA.  *Id.* (citing

21  *Weinberger v. Catholic Action of Hawaii*, 454 U.S. 139, 143 (1981); 42 U.S.C. § 4332(2)(C)).

22  "In a given situation a federal agency might have to include environmental considerations in its

23  decisionmaking process, yet withhold public disclosure of any NEPA documents, in whole or in

24

1   part, under the authority of an FOIA exemption." *Weinberger*, 454 U.S. at 143. In this case,

2   there are two relevant FOIA exemptions. Under 5 U.S.C. § 552(b)(1),[5] material classified as

3   secret in the interest of national security or foreign policy may be exempt from disclosure.

4   Under 5 U.S.C. § 552(b)(3), material specifically exempted by statute is also exempt from FOIA

5   requirements. 5 U.S.C. 552 (b)(3).[6] Thus, under these two exemptions, an agency may satisfy

6   NEPA requirements even while withholding materials it relied on during the environmental

7   review.[7] *See SLOMP*, 635 F.3d at 1116.

8        Ground Zero argues that the Navy violated NEPA requirements by failing to fully

9   describe the wharf project and its possible catastrophic impact on public safety. As evidence

10   they argue that the D5 missiles are more powerful than the earlier C4 missiles. The addition of

11   guided missile submarines complicates waterfront weapons handling in conjunction with ballistic

12   missile handling. Therefore the Explosives Safety Board "conditionally approved" weapons

13   handling from guided missile submarines if the Navy accepted the risk of a mishap that could

14   damage the Trident submarines. To compound the problem, Ground Zero cites the fact that the

15   fragment barrier was removed in 2011. The barrier is intended to contain the effects of an

16   accidental detonation of fuel.

17        The Navy's analysis of the risk of explosions is protected from disclosure by law and

18   therefore the Navy was not required to disclose it in a public NEPA document. The information

19

20   [5] FOIA exempts materials "specifically authorized under criteria established by an Executive order to be kept in secret in the interest of national defense or foreign policy and are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552 (b)(1).

21   [6] FOIA does not apply to materials "specifically exempted from disclosure by statute if that statute—(A) (i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and (B) if

22   enacted after the date of the OPEN FOIA Act of 2009, specifically cites this paragraph." 5 U.S.C. § 552(b)(3).

23   [7] Although an issue in this litigation has arisen regarding the Navy's inadvertent disclosure of certain documents, that does not affect whether or not the Navy was properly withholding such information during the environmental review process. Inadvertent disclosure for purposes of litigating these motions does not demonstrate the Navy was

24   improper in its earlier withholding.

that can be disclosed establishes that the chance of an explosion is below the established risk

threshold of one in a million. "Giving [the plaintiff] access to a classified report would defeat

the established equilibrium between the military's need for secrecy and the public's right to have

access to official information." *Hudson River Sloop Clearwater, Inc. v. Dep't. of Navy*, 891 F.2d

414, 423 (2d Cir. 1989). "The Department of Defense . . . regulations that govern base planning

have different aims and standards than NEPA." *Ground Zero for Non-Violent Action v. U.S.*

*Dep't of Navy*, 383 F.3d 1082, 1090 (9th Cir. 2004). The FEIS indicated that the EHW-2 would

comply with the Explosives Safety Board requirements.

## 1. Appendices A, B, and C, and the Facility Design Criteria

Here, the Navy withheld the three Appendices and the Facility Design Criteria under

§ 552(b)(3), because the Navy designated the documents as unclassified controlled nuclear

information("UCNI"). The Navy may designate information as UCNI and withhold that

information "as may be necessary to prohibit unauthorized dissemination . . . pertaining to

security measures, including security plans, procedures, and equipment for the physical

protection of special nuclear material." 10 U.S.C. § 128(a)(1). Further, the Navy may withhold

information that "could reasonably be expected to have a significant adverse affect on . . . the

common defense and security by significantly increasing the likelihood of . . . theft, diversion, or

sabotage of special nuclear materials, equipment, or facilities." 10 U.S.C. § 128(a)(2). Thus, if

the Navy properly designates information as unclassified controlled nuclear information, then

FOIA exempts that information from disclosure under NEPA. 5 U.S.C. § 552(b)(3).

The Supreme Court addressed precisely this issue in *Weinberger v. Catholic Action of*

*Hawaii/Peace Education Project*, 454 U.S. 139 (1981). The Supreme Court held that the Navy

may properly withhold some information from disclosure under NEPA if exempt under FOIA—

specifically, nuclear information.  *Id.* at 203.  Furthermore, the Court stated that the issue is beyond the judicial ken: "[P]ublic policy forbids maintenance of any suit in a court of justice, the trial of which would inevitably lead to the disclosure of matters which the law itself regards as confidential, and respecting which it will not allow the confidence to be violated."  *Id.* at 146 (quoting *Totten v. United States*, 92 U.S. 105, 107 (1876)).

The Navy properly designated the material as UCNI and therefore properly withheld the Appendices and the Facility Design Criteria.  Appendix A contains details on the "needs of the Navy's Trident program," including "the maintenance and testing of weapons systems" and the "loading and offloading of missiles."  Courts must give "substantial weight" to executive-agency classification decisions, and the Navy's treatment of Appendix A deserves such weight.  *Hunt v. CIA*, 981 F.2d 1116, 1119 (9th Cir. 1992); *Wiener v. FBI*, 943 F.2d 972, 980 (9th Cir. 1991).  The Navy properly reasoned that disclosing the details of the maintenance and handling of nuclear missiles could reasonably be expected to have a significant adverse affect on the common defense.

Moreover, the Court is unconvinced that withholding these materials is even significant.  Regarding Appendix A, both the draft and final EISs contain ample discussions of the need for a new explosive-handling wharf—the need being operational shortfall.  The Court sees no point in disclosing the details of weapons handling so that Plaintiffs may second guess the number of days the Navy requires use of an explosive-handling wharf.  NEPA does not allow such nitpicking.  *See Sierra Club v. Slater*, 120 F.3d 623, 637 (6th Cir. 1997); *see also Gulf Restoration Network v. U.S. Dept. of Transp.*, 452 F.3d 362, 367 (5th Cir. 2006) (noting that courts should avoid "fly-specking").  Thus, the Navy's late disclosure of portions of Appendix A had little, if any, effect on the public's ability to comment on the draft EIS.

The logic above applies equally to Appendices B and C and the Facility Design Criteria. The Court has reviewed the documents *in camera*, and each contains information that, if disclosed, could reasonably be expected to significantly and adversely affect national security. But the withheld information is not essential to determining the environmental consequences of building EHW-2. The Court recognizes the obvious and recurring tension between NEPA's disclosure mandate and the military's responsibility to keep sensitive information out of the wrong hands. But in this case, the Navy has shown that—although undisclosed—the Appendices and the Facility Design Criteria were properly considered in the EIS. In short, the Navy correctly designated these documents as UCNI, and they are therefore exempt from disclosure under NEPA.

## 2. The Business Case Analysis

Unlike the Appendices and the Facility Design Criteria, the Navy classified the Business Case Analysis and withheld it under 5 U.S.C. § 552(b)(1). The Case Analysis details the Trident program and its future needs, and it is the Case Analysis in which the Navy concluded that a second wharf was the only viable option. Plaintiff Glen Milner obtained a non-classified portion of the Business Case Analysis before publication of the final EIS, but Plaintiffs contend that some portion should have been directly included.

Plaintiffs have presented the Court with no reason to question the Navy's decision to classify the majority of the Business Case Analysis. The Analysis necessarily outlines how the Navy maintains its missiles, information that the Navy rightfully guards. Moreover, the key conclusion of the Analysis—that the Navy requires explosives handling wharves with 400 operational days—is fully discussed in both the draft and final EISs.

Lastly, the Court must note that there are pragmatic limits to a NEPA analysis. Plaintiffs appear to seek the Business Case Analysis so that they may investigate the 400 operational-day requirement. In other words, they seek to use NEPA to second guess the Navy's missile maintenance program. This is where the "rule of reason" must intervene.

NEPA mandates that a federal agency take a "hard look" at a decision's environmental consequences. *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982) (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)). That hard look requires, of course, that an agency publish the rationale behind its decision so that it may be weighed. But, how far down the decision-making rabbit-hole does NEPA allow a plaintiff to go? Can Plaintiffs demand access to the design specifications of a Trident submarine? The maintenance records of nuclear warheads? The dates and times the Navy's fleet expects to be in port? The rule of reason compels a court to use common sense. Here, the Court need not draw a line in the sand to see that Plaintiffs have stepped over it.

In sum, the Navy determined it had a problem: it requires use of an explosives handling wharf 400 operational days per year. The Navy proposed solutions to that problem, and NEPA mandates a hard look at the environmental consequences. It is clear that the Navy took the required "hard look.".. And given that the Navy fully explained the reason it wants (and needs) to build EHW-2—to solve the operational shortfall—it does not appear that nondisclosure of the Case Analysis would have had any effect on public input.

The Court therefore concludes that the Navy did not violate NEPA by refusing to disclose the classified parts of the Case Analysis.

**B.  The Navy Did Not Predetermine the Outcome of the EIS**

Ground Zero argues that the Navy's NEPA process merely sought to justify a decision already made.  Indeed, the Navy sought funding for the project before completing the EIS.

NEPA prevents agencies from committing resources prejudicing selection of alternatives before making a final decision.  40 C.F.R. § 1502.2(f).  A federal agency should prepare a NEPA analysis "early enough so that it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made." *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 892 (9th Cir. 2002) (citation omitted). Thus, an agency must complete its NEPA analysis before making an "***irreversible and irretrievable*** commitment of resources."  *WildWest Inst. v. Bull*, 547 F.3d 1162, 1168 (9th Cir. 2008) (emphasis added).

Plaintiffs have failed to show that the Navy irreversibly and irretrievably committed resources before finishing the EIS.  The Navy's pursuit of funding is not a commitment of the funds.  If the Navy had entered contracts to build the second wharf, that action might constitute an irreversible commitment.  For example, in *Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000), the court of appeals held that the National Oceanic and Atmospheric Administration ("NOAA") irreversibly committed resources by entering a formal agreement to support the Makah Tribe's whaling permit.  *Id.* at 1143–44.  The agency did so before completing an environmental assessment, and the court therefore ruled the assessment untimely.  *Id.*  There is no comparable commitment of resources here.  Seeking funding is not committing funds.

In short, the Navy did not take action that would adversely impact the environment, that would limit reasonable alternatives, or would otherwise commit resources before completing the EIS.

### C. The Navy Analyzed Reasonable Alternatives

Ground Zero argues that the Navy stated inflexible goals for the project's location, size and capacity. They claim the Navy established narrow parameters that made it impossible for the public to consider anything but a second EHW with admittedly excessive capacity in a spot dangerously close to the historic EHW. Ground Zero further argues that Navy improperly relegated the discussion of rejected alternatives to Appendix B, which was not disclosed.

Providing a range of alternatives is "the heart of the environmental impact statement." 40 C.F.R. § 1502.14. Agencies must "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons . . . ." *Id.* § 1502.14(a). The agency cannot define its objectives in "unreasonably narrow" terms so that "only one alternative from among the environmentally benign ones in the agency's power would accomplish the goals . . . ." *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1070 (9th Cir. 2010), *cert. denied*, 131 S. Ct. 1783 (2011) (citation omitted). Yet, agencies still "enjoy considerable discretion to define the purpose and need of a project." *Id.* (citing *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1066 (9th Cir. 1998) (internal quotation omitted)).

The purpose of this mission compels the decision to favor a second wharf rather than replace pilings at the same time the historic wharf is operational. The same considerations favor Bangor as the site for the second wharf serving the squadron of Trident submarines. The Navy intends to build the new wharf to support future requirements for the Trident submarines homeported at the Bangor waterfront and the Trident II (D5) Strategic Weapons System. As discussed above, the EIS outlines the Trident program, the use of explosives handling wharves, and the impending operational shortfall due to the repairs that must be made to the existing

wharf.  Without a new wharf at Bangor, the Navy would have a severe lack of wharf capacity for a decade and a continuing, although less severe, shortfall after that.

### 1.  Location

It is true that the Navy presented no alternative to the Bangor location.  As the EIS explains, Bangor is the ***only*** naval base on the west coast capable of supporting Trident submarines.  The Navy rejected the idea of using the only other Trident base—King's Bay, in Georgia—to fill the operational shortfall because even after the Navy completes repairs to the existing wharf in Bangor, it will ***still*** have an operational shortfall.  It makes no sense for the Navy to use King's Bay to simply dodge the Bangor problem as long as possible.  The Court has little trouble accepting the Navy's decision not to shift maintenance of the Pacific fleet to ***a different ocean***.

Moreover, Plaintiffs have not offered any viable options the Navy failed to consider.  To succeed on its claims, a plaintiff must offer "specific evidentiary facts" demonstrating that the unconsidered alternatives were "reasonable and viable."  *City of Angoon v. Hodel*, 803 F.2d 1016, 1022 (9th Cir. 1986) (citing *Friends of the Earth v. Coleman*, 513 F.2d 295, 298 (9th Cir. 1975) (noting also that alternatives "must be ascertainable and reasonably within reach")).  Plaintiffs have not suggested another option; they merely scold the Navy for refusing to consider an impossible scenario.

As for the location within Bangor, the Navy determined that the proposed site is the only location that maintains the required separation distances between facilities.  Again, Plaintiffs present no other option or reason to dispute the Navy's conclusion.

### 2. Size and Capacity

Plaintiffs have failed to show that the Navy presented an unreasonably narrow range of alternatives on the size and capacity of the proposed wharf. Ground Zero argues that the Navy evaluated alternative designs for the EHW-2, not alternatives to the EHW-2. Further, the alternatives contained a long list of predetermined features, including the use of a main wharf and warping wharf, lightning towers, heavy-duty cranes, a concrete shore-abutment, four new buildings, and a new security fence. Ground Zero speculates that the Navy should have considered using the existing wharf "around the clock," "ending use of the existing EHW after building a larger new EHW," and "shifting some operational days to Bangor's Delta Pier or Marginal Wharf [or King's Bay]." The Court disagrees.

The Navy did not unreasonably limit its alternatives. The EIS explains that a single explosives-handling wharf can provide only 305 operational days (365 days per year minus 60 days for maintenance). The Navy's D5 Life Extension Program requires 400 operational days. Thus, a single EHW cannot meet Trident program requirements. Ground Zero's alternatives simply fail the math.

As for predetermined features, Ground Zero fails to explain why or how the Navy could build an explosives handling wharf without these items. This Court has little expertise in wharf-design or submarine maintenance but it seems reasonable that all options would include lightning towers. It seems reasonable that all options include a crane. How else does one move a missile?

Contrary to Ground Zero's arguments, the Navy appears to have presented five reasonable alternatives to its selected design.[8] It proposed different configurations of trestles and pilings and an option for a floating wharf. Ground Zero fails to address these alternatives,

---

[8] The five alternatives were presented in addition to the no-option alternative.

explain why they are "unreasonably narrow," or suggest any "reasonable and viable" option that the Navy failed to consider. The size and "capacity" of the second wharf appears to be dictated largely by the size of Trident submarines and the work to be performed. If there is an argument that a smaller wharf is even possible, Plaintiffs have not raised it.

In short, there's only so many ways to build a wharf. Plaintiffs have not suggested one the Navy ignored.

### D. Mitigation Measures

The new wharf will indisputably affect the environment. As both the Plaintiffs and the Navy note, pile-driving may harm fish, marine mammals, and birds; the new wharf will displace eelgrass and shellfish and create an obstacle to migrating salmon. The Navy produced a 220-page appendix to the EIS, detailing its planned mitigation measures. In it, the Navy presents a number of actions designed to mitigate environmental harms. Pile-driving will occur only between July 16th and February 15th, outside the primary salmon runs. The Navy intends to use primarily vibratory drivers and an underwater bubble curtain to reduce noise. A system of acoustic monitoring will ensure that noise levels do not exceed targets. Moreover, the majority of this work will be done in the first year of construction.

The EIS also contains a "compensatory aquatic mitigation" plan, meant to offset the unavoidable damages caused by EHW-2. The Navy considered a number of options, but is proceeding to study restoration and conservation plans in Dabob Bay and Shine Tidelands State Park. The Navy met the requirements to discuss the potential effectiveness of the compensatory aquatic mitigation. The FEIS contains a detailed analysis of the benefits that would result from the planned restoration projects at Dabob Bay and Shine Tidelands.

NEPA requires agencies to "discuss potential mitigation measures in their EISs and decision documents." *Pacific Coast Fed. of Fisherman's Assocs. v. Blank*, 693 F.3d 1084, 1103

1 (9th Cir. 2012) (citing 40 C.F.R. §§ 1502.14(f), 1502.16(e)–(h), 1505.2(c), 1508.25(b)(3)). An

2 EIS must discuss mitigation "in sufficient detail to ensure that environmental consequences have

3 been fairly evaluated." *Id.* (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332,

4 353 (1989)). The discussion "necessarily includes an assessment of whether the proposed

5 mitigation measures can be effective." *Id.* (citing *S. Fork Band Council of W. Shoshone of Nev.*

6 *v. U.S. Dep't of Interior*, 588 F.3d 718, 727 (9th Cir. 2009)). Without a discussion of mitigation,

7 "neither the agency nor other interested groups and individuals can properly evaluate the severity

8 of the adverse effects." *Robertson*, 490 U.S. at 352. But importantly, NEPA contains no

9 substantive requirement "that a complete mitigation plan be actually formulated and adopted."

10 *Id.*

11     Here, the EIS explains how the adverse effects of the primary harm—pile driving—will

12 be attenuated by working outside the seasonal salmon runs, by noise monitoring, a bubble

13 curtain, and use of a vibratory hammer. By limiting the work window, the Navy should avoid

14 virtually all damage to chum salmon and most damage to the winter-run chinook. Indeed, less

15 than 2% of juvenile chum run occurs during the work window. The EIS explains that the

16 National Marine Fisheries Service will monitor other species and enforce many of the mitigation

17 measures.

18     **E.  The Navy Did Not "Fail to Evaluate a Possible Severe Impact"**

19     Ground Zero argues that the Navy failed to explore the possibly catastrophic results of an

20 explosive attack or accident, even though documents obtained through FOIA describe a risk that

21 missiles at one EHW could detonate missiles at the other EHW. In response, the Navy states that

22 it has considered the explosive hazard, including accident and terrorist attack, but the analyses

23

24

contain sensitive information and cannot be publicly disclosed. The analysis at issue is contained in Appendix C, discussed above.

This point is easily resolvable: the Navy has analyzed the explosive hazard; indeed, it is the explosive hazard that determines much of EHW-2's design. The information, however, is designated UCNI, and the Navy properly withheld it under FOIA. *See* 5 U.S.C. 552(b)(3). Again, this argument raises a difficult predicament: Plaintiffs cannot review the Navy's analysis and challenge it under NEPA without disclosure. But, NEPA does not guarantee access to confidential materials. *Weinberger v. Catholic Action of Hawaii*, 454 U.S. 139, 143 (1981). NEPA does mandate, however, that the Navy perform the environmental analysis, regardless of its disclosure. *Id.* After *in camera* review of Appendix C, the Court concludes that the Navy has met the requirements of NEPA.

## IV.     CONCLUSION

The Navy's Motion for Summary Judgment [Dkt. #99] is **GRANTED**. Ground Zero's Motion for Summary Judgment [Dkt. #91] is **DENIED**. The Navy met the requirements of NEPA and its implementing regulations. All claims advanced in Ground Zero's Complaint [Dkt. #1] are hereby **DISMISSED WITH PREJUDICE**.

IT IS SO ORDERED.

Dated this 8th day of January, 2014.

_____
RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE